# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| J. C. HILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-08-37-R |
| | ) | |
| MARATHON OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JC HILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-09-07-R |
| | ) | |
| KAISER-FRANCIS OIL COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| NAYLOR FARMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. CIV-08-668-R |
| | ) | |
| ANADARKO OGC COMPANY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER CERTIFYING STATE LAW
## QUESTIONS TO THE OKLAHOMA SUPREME COURT

Pursuant to Okla. Stat. tit. 20, § 1601, *et seq.*, this Court certifies the following questions of law in the three above-styled cases for answer by the Supreme Court of the State of Oklahoma:

1. When is gas "marketable" or how is the term "marketable" defined for purposes of determining when gas becomes a "marketable product" and whether production and post-production costs were incurred to make the gas "marketable" or were incurred to enhance the value of an already marketable product? *See Mittelstaedt v. Sante Fe Minerals, Inc.*, 1998 OK 7, 954 P.2d 1203.

2. Does the answer to question No. 1 necessarily depend on whether there is a market for the gas in its then existing form? *I.e.,* if there exists at least one purchaser willing to purchase the gas in its then-existing form, whatever that may be and even if the gas is in its raw, unprocessed form, is the gas properly considered marketable?

3. Because the implied duty to market includes the obligations of gathering, compression, dehydration, processing and treating necessary to make gas marketable, may a lessee/producer indirectly pay a midstream purchaser to perform these services by agreeing to accept as a purchase price from the midstream purchaser a percentage of what the midstream purchaser receives after such services have been performed from the sale to an interstate pipeline (or alternatively the amount the midstream purchaser receives from sale to an

interstate pipeline minus a fee charged by the midstream purchaser for the services it has performed) and then in effect pass the costs of the services performed by the midstream purchaser on to royalty owners by paying royalty based only on what the lessee/producer actually receives from the midstream purchaser?

The Court acknowledges that the Oklahoma Supreme Court may reformulate any or all of the certified questions.

### THE FACTS RELEVANT TO THE QUESTIONS AND THE NATURE OF THE CONTROVERSIES OUT OF WHICH THE QUESTIONS AROSE

The questions arose in three cases pending before this Court: *J.C. Hill, et al. v. Marathon Oil Company*, Case No. CIV-08-37-R; *Naylor Farms, Inc. v. Anadarko OGC Company, et al.*, Case No. CIV-08-668-R; and *J.C. Hill, et al. v. Kaiser Francis Oil Company*, Case No. CIV-09-07-R. The Court has already certified the *Naylor Farms* case as a class action. Motion for class certification remain pending in the other two cases in which the named Plaintiffs seek certification of state-wide classes of royalty owners. An issue of paramount significance in all three cases is the definition of "marketable" as applied to gas, i.e., when is gas considered "marketable" as that term is used in *Mittelstaedt v. Santa Fe Minerals*, 1998 OK 7, 954 P.2d 1203 (Okla. 1998) and prior and subsequent Oklahoma cases. Resolution of that issue will affect if not determine the outcome of the claims in the cases pending before this Court and also, depending upon how "marketable" is defined, may make class action certification inappropriate.

The named Plaintiffs, proposed class members and certified class members in the three cases (collectively, "Plaintiffs") own mineral interests in real property located in the State of Oklahoma. Plaintiffs' mineral interests are subject to oil and gas leases ("Leases"). Through these Leases, Defendants, Marathon Oil Company, Kaiser-Francis Oil Company, Anadarko OGC Company and Questar Exploration & Production Company (collectively "Producers") acquired the right to explore, drill and produce natural gas from the leased premises. In exchange, Plaintiffs retained royalty interests, entitling Plaintiffs to royalty payments for their proportionate share of any sale proceeds of production from wells on the leased premises (collectively, the "Subject Wells"). Thus, Plaintiffs are "royalty interest owners" or "royalty owners." Although the royalty clauses in the Leases of Plaintiffs' mineral interests vary (*e.g.*, "gross proceeds" versus "market value" leases), in general the Producers make no distinctions based on the differing royalty clause terms in the Leases in these cases, but rather, make royalty payments in a uniform manner.

When gas is extracted from a well, it is "unprocessed" or "raw" gas, *i.e.,* part of a mixed well-stream including oil, water, sediment and other impurities. Gas must be sufficiently free of impurities before it can enter the interstate pipeline system. Accordingly, "raw" or unprocessed gas usually undergoes certain field processes necessary to create a "marketable product." *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, ¶ 21, 954 P.2d 1203, 1208.

The processes necessary to prepare the gas for the pipeline include gathering, compression, dehydration, treating and processing. Sometimes these processes are

performed by the Producers while other times they are performed by midstream companies such as Defendant DCP Midstream, LP ("DCP"). Generally, midstream purchasers are engaged in the business of (1) obtaining raw natural gas from the wellhead; (2) gathering, compressing, dehydrating, treating and/or processing the gas; and (3) marketing and/or reselling the processed gas and/or other saleable hydrocarbon products to a downstream purchaser at the tailgate of the processing plant, the inlet of the interstate pipeline, or some other downstream pooling point. In all cases, the services performed by the midstream purchasers are done to put the gas into "pipeline quality" so that the residue gas meets the specifications necessary to be put in the interstate or intrastate pipeline where it is sold on the open market.

In each of the three cases, Plaintiffs contend that the manner in which the Producers structured the "sale" of the natural gas from the Subject Wells resulted in the underpayment of the Plaintiffs' royalties. The Producers either marketed the natural gas directly, or entered into contracts with midstream companies, some of which are affiliates of Producers. Producers classify these latter transactions, with midstream companies as "wellhead sales" and therefore contend that the gas is "marketable" at the wellhead, such that they are entitled to deduct whatever a midstream company "charges" them to gather, compress, dehydrate, treat and/or process the gas and market and/or resell it from the gas sale proceeds on which royalties are calculated and paid.

The contracts between the Producers and the midstream companies allow the midstream companies to acquire title to or possession of the raw gas at the wellhead. The

midstream companies are then responsible for gathering, compressing, dehydrating, treating and processing the raw/natural gas, such that the physical condition and the quality of the gas is changed to meet the demands of downstream purchasers or the specifications of the interstate pipeline. After the midstream companies perform these services or processes, they transport and sell the gas to various downstream purchasers at the tailgate of the processing plant, the inlet of the interstate pipeline, or some other downstream pooling point.

Although the midstream companies acquire title or possession of the raw natural gas at the wellhead, the Producers and the midstream companies look to the downstream sales, sometimes characterized as "resales," to determine the price of the "wellhead sale." That is, the price paid to the Producers by the midstream companies is not established, and no money changes hands, until the gas is sold to a downstream purchaser at the tailgate of the processing plant, the inlet of the interstate pipeline, or some other downstream pooling point. This is accomplished by three types of contractual arrangements: (1) percentage-of-proceeds contracts; (2) fee-based contracts; and (3) negotiated flat-rate contracts. Under a percentage-of-proceeds contract, a midstream company pays a Producer a percentage of what the midstream company receives from the downstream sale of gas. Under a fee-based contract a midstream company pays a Producer what the midstream company receives from the downstream sale of gas minus a fee that the midstream company charges for gathering, compressing, dehydrating, treating, processing, transporting and/or marketing the raw natural gas from the wellhead. Under a flat-rate contract, a Producer receives from a midstream company a flat rate for the raw natural gas at the wellhead and the midstream company

receives as a fee for gathering, compressing, dehydrating, treating, processing, transporting and/or marketing the difference between the proceeds received from the downstream sale and the negotiated flat-rate that is paid to the Producer for raw natural gas at the wellhead. Under each of these types of contractual arrangements, the midstream companies retain, as a fee, some portion of the downstream sales proceeds in exchange for gathering, compressing, dehydrating, treating, processing and marketing the natural gas from the Subject Wells and the "gross" production proceeds the Producers receive from the downstream sales are reduced by the proceeds retained by the midstream companies for performing the described services. The Producers calculate and pay royalty based upon the production proceeds they actually receive from the midstream companies, although the production proceeds received by the Producers are reduced by the sales proceeds retained by the midstream companies in exchange for performing the described services. The propriety of Producers calculating the royalty owners' payments based on the sale of gas at the wellhead to a midstream companies in exchange for the midstream companies assuming the obligations of gathering, compressing, dehydrating, treating, processing and marketing the gas is the main issue in these cases.

Producers take the position that a single wellhead sale of raw and unprocessed gas to a midstream company conclusively establishes the marketability of the natural gas produced from a Subject Well. The Producers contend that gas is marketable if even one purchaser is willing to purchase raw, unprocessed natural gas, despite the fact that the wellhead purchase price is based upon a downstream sale at the tailgate of the processing plant, the inlet of the

interstate pipeline, or some other downstream pooling point, and the downstream sale is a sale of "pipeline quality" gas, not raw gas. In other words, Producers argue that the gas is "marketable" when it leaves the lease site meter, regardless of the quality of the gas, or the need for further treatment or processing prior to the gas being sold. They also contend, therefore, that the services and processes performed by the midstream companies – gathering, compression, dehydration, processing and treating – present post-production costs which are associated with transforming an already marketable product into an enhanced product, *see Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, ¶¶ 26, 29 & 30, 954 P.2d at 1209 & 1210, which may properly be borne by the royalty interest owners, provided they are reasonable and increase royalty revenues proportionately. *See id.* Thus Producers contend that it is proper to calculate and pay royalty interests based upon the sale proceeds Producers receive from which the midstream companies' costs have in effect already been deducted, either as the fees paid to the midstream companies or in the percentage of proceeds the midstream companies retain.

Plaintiffs contend that raw, unprocessed natural gas is not in a marketable condition at the wellhead. Plaintiffs assert that, to circumvent their duty to perform certain services or processes they contend are necessary to put the gas in marketable form, Producers indirectly paid midstream companies to gather the raw gas and perform those services and processes in exchange for a purchase price that in effects, directly or indirectly, deducts the midstream companies' costs, which the producers would and should have been required to bear if they had performed those services themselves, from Plaintiffs' royalty interest payments. Thus,

Plaintiffs contend that Producers violated their implied duty to market by improperly deducting, either directly or indirectly, from the Plaintiffs' royalty payments, production and post-production costs necessary to transform the raw natural gas from the Subject Wells into a marketable product.

## THE NAMES AND ADDRESSES OF COUNSEL OF RECORD FOR ALL PARTIES

*Hill, et al. v. Marathon Oil Company*, **Case No. CIV-08-37-R**

Plaintiffs
J.C. and Alice Hill                E. Edd Pritchett, Jr.
                                   Jami R. Antonisse
                                   Michael L. Darrah
                                   R. Brad Miller
                                   Durbin, Larimore & Bialick, P.C.
                                   920 N. Harvey Ave.
                                   Oklahoma City, OK 73102
                                   405-235-9584

Defendant
Marathon Oil Company               C. Robert Stell
                                   Harvey D. Ellis, Jr.
                                   Charles B. Goodwin
                                   Mark D. Christiansen
                                   Crowe & Dunlevy
                                   20 North Broadway Ave., Ste. 1800
                                   Oklahoma City, OK 73102
                                   405-235-7700

*Hill, et al. v. Kaiser-Francis Oil Company*, **Case No. CIV-09-07-R**

Plaintiffs
J.C. and Alice Hill                E. Edd Pritchett, Jr.
                                   Jami R. Antonisse
                                   Michael L. Darrah
                                   R. Brad Miller
                                   Durbin, Larimore & Bialick, P.C.

|  |  |
|---|---|
|  | 920 N. Harvey Ave.<br>Oklahoma City, OK 73102<br>405-235-9584 |
| Defendant<br>Kaiser-Francis Oil Company | Erica A. Dorwart<br>Frederic Dorwart<br>J. Michael Medina<br>Paul DeMuro<br>Frederic Dorwart PC<br>124 E. 4th St., Ste 100<br>Tulsa, OK 74103<br>918-583-9922 |
|  | Henry A. Meyer, III<br>Ryan T. Leonard<br>Meyer & Leonard PLLC<br>116 E. Sheridan, Ste. 207<br>Oklahoma City, OK 73104<br>405-702-9900 |

*Naylor Farms, Inc. v. Anadarko OGC Company, et al.,* **Case No. CIV-08-668-R**

| | |
|---|---|
| Plaintiff<br>Naylor Farms, Inc. | Conner L. Helms<br>Darren R. Cook<br>Erin M. Moore<br>Gary R. Underwood<br>Helms & Underwood<br>120 N. Robinson Ave., Ste. 2500<br>Oklahoma City, OK 73102<br>405-319-0700 |
| Defendant<br>Anadarko OGC Company | Dennis C. Cameron<br>M. Benjamin Singletary<br>Lisa T. Silvestri<br>Gable & Gotwals<br>100 W. 5th St., Ste 1100<br>Tulsa, OK 74103 |

|  |  |
|---|---|
|  | 918-595-4800 |
| Defendant<br>Questar Exploration<br> and Production Company | James Hardwick<br>Mark Banner<br>Pamela S. Anderson<br>Hall Estill<br>320 S. Boston Ave., Ste. 200<br>Tulsa, OK 74103<br>918-594-0434 |
| Defendant<br>Duke Energy Field Services, Inc. | Daniel M. McClure<br>Fulbright & Jaworski<br>1301 McKinney St., Ste. 1500<br>Houston, TX 77010<br>713-651-5159<br><br>James Hardwick<br>Mark Banner<br>Michael E. Smith<br>Pamela S. Anderson<br>Hall Estill<br>320 S. Boston Ave., Ste. 200<br>Tulsa, OK 74103 |
| Defendant<br>DCP Midstream LP | James Hardwick<br>Mark Banner<br>Michael E. Smith<br>Pamela S. Anderson<br>Hall Estill<br>320 S. Boston Ave., Ste. 200<br>Tulsa, OK 74103<br>918-594-0434 |

IT IS SO ORDERED this 12th day of February, 2010.

*[signature: David L. Russell]*

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE